# STATE OF LOUISIANA
## COURT OF APPEAL, THIRD CIRCUIT

## 23-100


**JANET THYMES**

**VERSUS**

**GOLDEN NUGGET LAKE CHARLES, LLC**



**\*\*\*\*\*\*\*\*\*\***

APPEAL FROM THE
FOURTEENTH JUDICIAL DISTRICT COURT
PARISH OF CALCASIEU, NO. 2017-4773
HONORABLE CLAYTON DAVIS, DISTRICT JUDGE

**\*\*\*\*\*\*\*\*\*\***

**WILBUR L. STILES**
**JUDGE**

**\*\*\*\*\*\*\*\*\*\***

Court composed of Candyce G. Perret, Jonathan W. Perry, and Wilbur L. Stiles, Judges.




**AFFIRMED.**

**Mark A. Delphin**
**Delphin Law Offices**
**626 Broad Street**
**Lake Charles, LA 70601**
**(337) 439-3939**
**COUNSEL FOR PLAINTIFF/APPELLANT:**
    **Janet Thymes**

**Arthur J. O'Keefe**
**Of-Counsel for Delphin Law Offices**
**626 Broad Street**
**Lake Charles, LA 70601**
**(337) 309-6122**
**COUNSEL FOR PLAINTIFF/APPELLANT:**
    **Janet Thymes**

**Christopher P. Ieyoub**
**Kyle M. Beasley**
**Plauche, Smith & Nieset, LLC**
**P.O. Drawer 1705**
**Lake Charles, LA 70601**
**(337) 436-0522**
**COUNSEL FOR DEFENDANT/APPELLEE:**
    **Golden Nugget Lake Charles, LLC**

**STILES, Judge.**

A jury returned a verdict on March 10, 2022, finding that the appellee, Defendant Golden Nugget Lake Charles, LLC ("the Golden Nugget"), did not have actual or constructive knowledge of the existence of an unsecured chair at the Golden Nugget casino, nor did the appellant, Plaintiff Janet Thymes, suffer injuries as a result of her fall from said unsecured chair. Ms. Thymes appeals the trial court's March 18, 2022 judgment making the jury verdict the judgment of the court and dismissing Ms. Thymes' claims against the Golden Nugget, with prejudice, at Ms. Thymes' cost. For the reasons set forth below, we affirm the judgment of the trial court.

## FACTS AND PROCEDURAL HISTORY

On March 4, 2017, Ms. Thymes and her friend Melissa Mills drove from Houston, Texas to attend a concert at the L'Auberge Casino in Lake Charles, Louisiana. After the concert, Ms. Thymes and Ms. Mills went over to the Golden Nugget casino to play the slot machines. Once at the Golden Nugget, the women separated and went to different areas of the casino. A little after 10:00 p.m., Ms. Thymes sat in a chair directly facing a slot machine. As she leaned back in the chair, the chair fell over backwards, causing Ms. Thymes to fall to the floor, landing on her left side. Acadian Ambulance Service transported Ms. Thymes to the emergency room at Christus St. Patrick Hospital in Lake Charles, where she was seen by Dr. Kamran Chaudary.

Ms. Thymes filed a Petition for Damages on November 13, 2017, alleging that as a result of her fall at the casino, she suffered "painful personal injuries to her neck, back, shoulders, left wrist, knees and other parts of her mind and body, including her muscles, ligaments, nerves and tissues." The Golden Nugget and Gasser Chair

Company, Inc. were named as defendants in the petition with claims asserted against them for negligence, fault, want of care, and/or strict liability.[1]

A jury trial commenced on March 7, 2022. After several days of testimony and evidence, the jury returned a verdict on March 10, 2022, finding that the Golden Nugget did not have actual or constructive knowledge of the existence of the unsecured sled base chair and that Ms. Thymes did not suffer injuries as a result of the March 4, 2017 incident. The trial court rendered judgment on March 18, 2022, making the jury's verdict a judgment of the court, denying and dismissing all of Ms. Thymes' claims against the Golden Nugget with prejudice and assessing Ms. Thymes with all costs.

Ms. Thymes filed a Motion for a Judgment Notwithstanding the Verdict and, in the Alternative, Motion for a New Trial, arguing that the evidence in the record, as well as the facts and inferences, were so strongly and overwhelmingly in her favor and against the Golden Nugget on the issues addressed by the jury that reasonable persons could not have arrived at the jury verdict on which the March 18, 2022 judgment was based. Alternatively, Ms. Thymes argued that because the jury verdict was so clearly contrary to the law and evidence, she was entitled to a new trial. A hearing was held before the trial court on May 23, 2022, after which an order was issued denying Ms. Thymes' motion and finding that "reasonable minds could conclude that the Golden Nugget casino did not have constructive knowledge of the slot chair that was allegedly defective and caused the alleged injury to the Plaintiff."

---

[1] Ms. Thymes' claims against Gasser Chair Company, Inc. were dismissed with prejudice pursuant to a February 4, 2021 judgment granting Gasser Chair Company's motion for summary judgment.

## ASSIGNMENTS OF ERROR

Ms. Thymes has appealed the jury's March 10, 2022 verdict, asserting that the jury committed manifest error in reaching a decision which was clearly wrong and contrary to the evidence and applicable law. She asserts four assignments of error:

1. The jury failed to conclude that the "sled chair" posed an unreasonable risk of injury to Ms. Thymes and other patrons.

2. The jury refused to find that the "Golden Nugget", through its employees, had constructive knowledge/notice of the unsecured "sled chair."

3. The jury failed to find that the "Golden Nugget" did not use reasonable care to remove the danger posed to Ms. Thymes by the "sled chair."

4. The jury refused to find that Ms. Thymes was injured in the fall at the "Golden Nugget" and, failed to assess damages for past and future medical expenses, past and future pain and suffering, permanent disability, past and future mental anguish, and loss of the ability to enjoy life.

Ms. Thymes thus presents two issues for review: (1) whether the jury committed manifest error and/or issued a verdict which was clearly wrong in failing to find the Golden Nugget at fault for her March 4, 2017 fall; and (2) the nature and extent of Ms. Thymes' injuries and damages.

## DISCUSSION

### *Standard of Review*

When reviewing a verdict in a civil case, the manifest error-clearly wrong standard applies, and the appellate court should not disturb a finding of fact made in the trial court unless it is clearly wrong. The Louisiana Supreme Court fashioned a two-part test when applying this standard: (1) is there a reasonable factual basis for the finding of the trial court; and (2) does a reading of the record establish that the finding is not clearly wrong or manifestly erroneous. *Arceneaux v. Domingue*, 365

3

So.2d 1330 (La.1978). In *Rosell v. ESCO*, 549 So.2d 840, 844 (La.1989), the court

discussed the manifest error-clearly wrong standard in detail, stating:

> It is well settled that a court of appeal may not set aside a trial
> court's or a jury's finding of fact in the absence of "manifest error" or
> unless it is "clearly wrong," and where there is conflict in the testimony,
> reasonable evaluations of credibility and reasonable inferences of fact
> should not be disturbed upon review, even though the appellate court
> may feel that its own evaluations and inferences are as reasonable.
> *Arceneaux v. Domingue*, 365 So.2d 1330, 1333 (La.1978); *Canter v.
> Koehring*, 283 So.2d 716, 724 (La.1973). . . . [I]f the trial court or jury
> findings are reasonable in light of the record reviewed in its entirety,
> the court of appeal may not reverse even though convinced that had it
> been sitting as the trier of fact, it would have weighed the evidence
> differently. Where there are two permissible views of the evidence, the
> factfinder's choice between them cannot be manifestly erroneous or
> clearly wrong. *Arceneaux*, supra at 1333, *Watson v. State Farm Fire &
> Casualty Ins. Co.*, 469 So.2d 967 (La.1985). . . .
>
> When findings are based on determinations regarding the
> credibility of witnesses, the manifest error-clearly wrong standard
> demands great deference to the trier of fact's findings; for only the
> factfinder can be aware of the variations in demeanor and tone of voice
> that bear so heavily on the listener's understanding and belief in what
> is said. *Canter*, supra at 724.

Thus, "[a] jury's findings of fact should be affirmed unless characterized by manifest

error, and should not be upset except in the most compelling and clearest case of

error." *Arnold v. T.G. & Y. Stores Co.*, 466 So.2d 529, 532 (La.App. 3 Cir.), *writ

denied*, 470 So.2d 126 (La. 1985).

### The Unsecured Sled Chair

Ms. Thymes claims she was injured when the chair she sat in at the Golden

Nugget casino suddenly fell backwards, causing her to fall onto the floor. The chair

at issue is a "sled-based chair." The cushioned seat of this chair is attached to a single

post which is in turn welded to a metal plate resembling a sled. The sled part of the

chair is what rests on the floor. Gasser Chair Company, Inc. manufactured and sold

the chair to the Golden Nugget. Mark Gasser, the president of Gasser Chair

4

Company, testified at trial via video deposition. He explained that there is an upturned lip on the front of the sled-base that is designed to engage in the female bracket attached to the base of the slot machine. The sled-based chair is intended to be attached to the base of the slot machine cabinet so that it remains in a fixed position and is not moved by patrons of the casino.

It is uncontested that the casino's video surveillance the night of the incident shows an unidentified patron of the casino dislodging the sled-based chair at issue at approximately 7:06 p.m. While standing behind the chair, this patron leaned against the back of it, tilting it forward so that he could reach the slot machine over the chair. In doing so, he dislodged the sled-base of the chair, causing it to become detached from the bracket at the base of the slot machine. The chair remained in its original position before the slot machine; it was simply free-standing and no longer attached to the slot machine. Video surveillance further shows multiple casino employees walking past the unattached chair without seeming to notice it is no longer attached, as well as multiple casino patrons sitting in the chair throughout the evening without difficulty. Ms. Thymes then sat in the chair at approximately 10:05 p.m. and immediately fell backward.

***Was the Golden Nugget at Fault for Ms. Thymes' Fall***

The verdict form filled out by the jurors at the trial of this matter included four initial questions:[2]

1. Did the unsecured sled base chair pose an unreasonable risk of injury to Janet Thymes?

---

[2] We note that the first three questions of the verdict form follow La.R.S. 9:2800.6(B), which requires a claimant alleging a negligence claim against a merchant to prove ***all*** of the following elements of his cause of action: (1) the condition presented an unreasonable risk of harm to the claimant and that risk of harm was reasonably foreseeable; (2) the merchant either created or had actual or constructive notice of the condition which caused the damage, prior to the occurrence; and (3) the merchant failed to exercise reasonable care.

2. Prior to Janet Thymes' fall, did the Golden Nugget Casino have actual or constructive knowledge of the existence of the unsecured sled base chair?

3. Did Golden Nugget fail to exercise reasonable care to avoid the danger posed to Janet Thymes?

4. Did Janet Thymes suffer injuries as a result of the March 4, 2017, incident?

The jury checked off "No" for the second question (did the Golden Nugget Casino have actual or constructive knowledge of the existence of the unsecured sled base chair) and checked off "No" for the fourth question (did Janet Thymes suffer injuries as a result of the March 4, 2017, incident). The jury did not record any responses to questions one and three. However, we note that following question four, the verdict form instructs, "If the answer is 'No' to *any of the above*, sign this verdict form and return the form to the court representative." (Emphasis added.) Thus, the jury followed directions by returning the form once they had answered "No" for two of the questions. While it was noted by the trial court and counsel at the time the verdict was read in open court, neither party objected to the fact that two questions remained unanswered and neither party asked that the verdict form be returned to the jury for completion of questions one and three.

Ms. Thymes' assignments of error follow questions one through four of the verdict form. We note that assignments of error one through three all relate to whether the Golden Nugget was at fault for Ms. Thymes' fall.

**Assignment of Error Number 1**

Ms. Thymes' first assignment of error is whether the jury was clearly wrong by failing to conclude that the sled-based chair posed an unreasonable risk of injury to Ms. Thymes and other patrons. Ms. Thymes argues in her brief that the sled-based chair has an innate potential to fall over backwards because the post supporting the

chair is positioned to the rear of the sled base such that the backrest extends beyond the sled base. The chair is meant to be secured into the bracket attached to the slot machine, preventing it from falling over. The parties stipulated at trial that there were twelve instances of people falling over in unsecured sled-based chairs between 2014 (when the casino opened) and this incident in 2017. In addition, when the Golden Nugget purchased the chairs from Gasser Chair Company, a brochure was included with the chairs advising that they were meant to be secured into the base of the slot machine cabinet. Yet the Golden Nugget continued to allow patrons to sit in unsecured sled-based chairs.

The jury chose not to answer question one, whether the chair posed an unreasonable risk of injury. We note that a sled-based chair was introduced into evidence at trial and, when requested by the jury during deliberations, sent to the jury for inspection. They, therefore, had access to and were able to sit in a chair which was the same model as the chair at issue.

Jason English testified at trial as an expert in the field of safety engineering. After examining and testing the sled-based chair, he opined at trial that this kind of chair is not designed for stability when disconnected, as it does not have a wide enough base of support towards the rear of the chair. It is, therefore, not safe for a patron's use when unsecured. However, when questioned in more detail about his testing of the sled-based chair's stability, Mr. English admitted that he did not conduct any force testing on the chair while it was occupied, nor did he place weights in the chair during his force testing to simulate the weight of a human occupant. In addition, none of his computer modeling or other scientific methods attempted to simulate a human occupant in the seat.

Velma Mock, the safety manager for the Golden Nugget, also testified at trial. When questioned about other patrons sitting in the unattached chair at issue prior to Ms. Thymes' fall, she testified to the following:

Q.    Are you aware of any other guests who sat in this chair in that same manner on the night that Ms. Thymes had her incident?

A.    That particular chair that's –

Q.    That particular chair.

A.    Yes, sir. Oh, yeah.

Q.    Are you aware –

A.    There was several.

Q.    You say "Several." Are you aware of how many?

A.    Nine, ten in that three-hour clip that we have coverage of.

Q.    And how is it that you know that it's nine or ten people?

A.    Because I counted when I watched the surveillance.

Q.    And when you say, "surveillance," is that video?

A.    The surveillance video, yes, sir.

Q.    So you've seen video of nine other people sitting in that chair before Ms. Thymes?

A.    Yes, sir.

Q.    Did any of them fall?

A.    No, sir.

Q.    Did any of them appear to have a problem?

A.    No, sir.

Ms. Mock did acknowledge that there had been previous cases where a patron tilted over and fell while sitting in an unattached sled-based chair at the casino. She specified, however, that, in the three-year period that the casino had been open,

8

"there was just a couple of handfuls, and that's out of the millions of people that visit the casino floor every year. I mean, just in 2017, we had over 3 million people visit the casino floor."

Furthermore, while Mr. Gasser acknowledged in his video deposition testimony that the sled-based chair is designed to be used for patron seating only when attached to the bracket on the slot machine, he testified that he was not aware of anyone in his company falling over while sitting in a free-standing sled-based chair. In fact, he himself sat, and even stood, on an unattached sled-based chair and did not fall.

While there is some testimony and evidence in the record to support Ms. Thymes' argument that the unsecured sled-based chair posed a risk of injury to her and other patrons, we find that there is also adequate testimony and evidence in the record to reasonably support the conclusion that an unattached sled-based chair does not inherently present an unreasonable risk of injury. We, therefore, find no merit in Ms. Thymes' argument that the jury should have concluded the sled-based chair posed an unreasonable risk of injury to patrons of the casino.

**Assignment of Error Number 2**

Ms. Thymes' second assignment of error is whether the jury was clearly wrong in finding that the Golden Nugget had no constructive knowledge/notice of the unsecured sled-based chair. We note that the jury did check off "No" to this question on the verdict form, finding that the Golden Nugget had no actual or constructive knowledge of the existence of the unsecured sled-based chair.

As defined by La.R.S. 9:2800.6(C)(1):

> "Constructive notice" means the claimant has proven that the condition existed for such a period of time that it would have been discovered if the merchant had exercised reasonable care. The presence

9

of an employee of the merchant in the vicinity in which the condition exists does not, alone, constitute constructive notice, unless it is shown that the employee knew, or in the exercise of reasonable care should have known, of the condition.

Ms. Thymes notes that the chair at issue remained unattached for approximately three hours prior to her fall. The unidentified patron dislodged it at approximately 7:06 p.m., and Ms. Thymes fell over in the chair at approximately 10:05 p.m. During that three-hour period, as shown in the Golden Nugget's surveillance video, over fifty casino employees walked past the unattached sled-based chair and none of them stopped to reattach it. Ms. Thymes further suggests that the casino employee monitoring the surveillance video should have noticed the chair had become unattached.

The Golden Nugget addresses this assignment of error in its appellee brief. It acknowledges that the video surveillance shows various casino employees walking past the unattached chair; however, it simply does not show that any of them had actual knowledge that the chair had become unattached. While casino employees are in the vicinity of the chair, most do not even look in the direction of the chair. And those that do look towards the chair only glance in its direction or have their view obstructed by casino patrons. Thus, there is nothing to show that anyone employed by the Golden Nugget had actual knowledge that the chair was unattached.

As for whether any casino employee had constructive knowledge of the unattached chair, the Golden Nugget notes that the definition of "constructive notice" included in La.R.S. 9:2800.6(C)(1) (emphasis added) requires the claimant to prove "that the condition existed for such a period of time that it would have been discovered *if the merchant had exercised reasonable care*." It is specifically noted that "[t]he presence of an employee of the merchant in the vicinity in which the

10

condition exists does not, alone, constitute constructive notice *unless it is shown that the employee knew, or in the exercise of reasonable care should have known, of the condition.*" *Id*. (Emphasis added.) The Golden Nugget argues that the question then becomes whether any evidence was submitted at trial showing any Golden Nugget employee failing to exercise reasonable care.

The Supreme Court has found "that where a claimant is relying upon constructive notice under La.R.S. 9:2800.6(B)(2) (1991), the claimant must come forward with positive evidence showing that the damage-causing condition existed for some period of time, and that such time was sufficient to place the merchant defendant on notice of its existence." *White v. Wal-Mart Store, Inc.*, 97-393, p. 1 (La. 9/9/97), 699 So.2d 1081, 1082. "Whether the period of time is sufficiently lengthy that a merchant should have discovered the condition is necessarily a fact question[.]" *Id.* at 1084. Ms. Thymes has shown, through the Golden Nugget's video surveillance, that the chair at issue remained unattached for three hours. We must consider, under the specific facts of this case, whether the employees of the Golden Nugget were exercising reasonable care during that three-hour period when they failed to notice and reattach the sled-based chair.

In viewing the video surveillance taken the night of Ms. Thymes' fall, we note that the sled-based chair at issue remained in its place in front of the slot machine throughout the three hours that it remained unattached. The video surveillance produced in evidence to this court is the same video surveillance shown to the jury during Ms. Mock's testimony and Mr. English's testimony in an effort to show how many casino employees walked past the unattached sled-chair without stopping to reattach it.

11

During his testimony, Mr. English was shown a still shot from the video surveillance as well as a clip of the surveillance video which appear to show the patterned carpet of the casino visible between the black base of the slot machine cabinet and the sled base of the front of the chair. According to Mr. English, the fact that a slice of the carpet was able to be seen between the base of the slot machine and the front of the sled base of the chair should have put a casino employee on notice that the chair had become unattached.

Ms. Mock was asked during her testimony about casino employees identifying unattached sled-based chairs:

> Q.     So one of the things that – that a casino worker can do to, for example, identify whether sled-based chairs are attached or not is they can – they can sort of stand at the end of a row and sort of look down the row, and if the chairs – the chairs are all lined up, that's a good indication they're all attached?
>
> A.     If there's not a lot of guests or activity on that bank, yes, they should be able to see them. But if it's a busy bank and there's a lot of guests using the chairs or standing around, they won't be able to see the backs of the chairs that well.

When questioned whether an unattached sled-based chair could become a hazard, she specified that it could become a tripping hazard if pushed out into the middle of the aisle. However, the distance of the unattached chair from the slot machine and the busy nature of the casino would affect whether the unattached nature of the chair would be noticed by a casino employee.

> Q.     You were asked some questions by Mr. O'Keefe about people's ability to look at the backs of these chairs and tell if one of them is detached.
>
> [Ms. Mock]. Yes, sir.
>
> Q.     Is that the case when a chair is – is detached by maybe a foot or more?

A.      If it's detached and pulled a foot or more away from the machine that's pretty far away from the machine, yes, sir. Again, that would depend on if the bank is busy and there's a lot of – a lot of guests, a lot of people down that bank. I mean, if – if it's a congested area, you're not even going to see the chair, you know.

Q.      A foot would be fairly obvious?

A.      Uh-huh (yes).

Q. What about like if the – if the chair has been detached but a guest has scooted it all the way back flush against the slot machine –

A.      You're not going to notice.

Q.      -- do you think it would be obvious then?

A.      No, sir.

Q.      What if it's detached by one centimeter, do you think it would be obvious then?

A.      No, sir.

We have viewed the video surveillance clips, as well as the still shots from those video surveillance clips, shown to the jury during trial and introduced into evidence. Mr. English is correct that if you look very closely, you can see, at times, about half an inch to an inch of carpet between the base of the slot machine and the front of the sled base of the chair. We note, however, that the video surveillance was filmed from above looking down onto the chair and slot machine. We are unable to speculate what the view would have been from someone simply walking by the chair. Furthermore, the sliver of carpet between the slot machine and the base of the chair is only seen when the chair is empty. During the three-hour period that the chair remained unattached, multiple patrons sat in it to play the slot machine. Furthermore, the chair is never pushed more than an inch away, at most, from the slot machine. To a casino employee walking by, in an often-crowded aisle, the unattached chair would not stand out as being out of line with the rest of the chairs along that aisle.

While Ms. Thymes has argued that the casino employee monitoring the video surveillance that evening should have noticed the unattached nature of the chair, no evidence or testimony was presented at trial to show (1) whether a casino employee is actually engaged in monitoring all video surveillance in real time as it is being filmed, and (2) even if an employee is monitoring the video surveillance in real time, the amount of video cameras they are responsible for viewing.

Even though the chair remained unattached for approximately three hours prior to Ms. Thymes' fall, we cannot find that the jury was unreasonable or clearly wrong in finding that the Golden Nugget did not have actual or constructive notice of the unsecured sled-based chair. There is no evidence to suggest that any of the casino employees failed to exercise reasonable care in their duties the night of the incident. The jury's finding is not manifestly erroneous or clearly wrong. Thus, we find that this assignment of error lacks merit.

**Assignment of Error Number 3**

Ms. Thymes' third assignment of error is whether the jury was clearly wrong in failing to find that the Golden Nugget did not use reasonable care to remove the danger posed to Ms. Thymes by the sled-based chair. The jury chose not to answer this question on the verdict form.

In her appellant brief, Ms. Thymes asserts that the evidence is uncontradicted that the Golden Nugget (1) failed to reasonably identify an unsecured sled-based chair as an unreasonable safety hazard, (2) failed to train its employees to identify and correct unsecured sled-based chairs, and (3) failed to develop and implement an effective inspection program to reasonably discover and correct unsecured sled-based chairs.

14

Ms. Thymes contends that the Golden Nugget failed to assess or investigate the risk posed to its patrons by unsecured sled-based chairs. Mr. English, Ms. Thymes' expert in safety engineering, testified at trial that after the first patron fell over in an unsecured sled-based chair, the Golden Nugget should have conducted an investigation to determine the cause of the incident and should have identified unsecured sled-based chairs as a safety hazard. He further opined that the Golden Nugget should have then implemented safety programs, training its employees to conduct safety inspections and recognize when sled-based chairs are unattached.

Ms. Mock, the Golden Nugget's safety manager, testified that whenever any incident was reported, such as a patron falling from a chair, the incident was investigated by the safety department during which they watched surveillance footage and read through reports and statements. The safety department's position continued to be that unsecured sled-based chairs are safe for use by patrons. According to Ms. Mock, the purpose of attaching sled-based chairs to the slot machines was to maintain a clean line down the casino aisles, keeping it "nice, clean, neat, aesthetically pleasing to the eye." The fact that sled-based chairs could be attached to the slot machines also meant they could not be moved out into the middle of the aisle, creating a tripping hazard. The Golden Nugget considers any chairs moved out of place and into the center of the aisle a safety hazard as patrons could trip over the chairs. Thus, casino employees are instructed to reposition and reattach chairs that have been moved away from the slot machines into the aisle.

The issue of whether unsecured sled-based chairs are unreasonably dangerous to patrons was discussed above under assignment of error number one. For the reasons previously discussed, we found that the jury could have reasonably concluded, based on all of the evidence and testimony presented at trial, that an

unsecured sled-based chair is not unreasonably dangerous. Furthermore, based on Ms. Mock's testimony, the jury could have reasonably concluded that the Golden Nugget did have procedures in place for investigating an incident involving a patron falling from a chair and identifying and reattaching unattached sled-based chairs.

We further addressed the issue of whether the Golden Nugget employees used reasonable care to remove the danger posed to Ms. Thymes under assignment of error number two. For the reasons previously discussed, we found that the jury could have reasonably concluded, based on all of the evidence and testimony presented at trial, the Golden Nugget employees used reasonable care when walking the aisles looking for any potential safety hazards. The unattached nature of the chair at issue was not obvious as it remained in place before the slot machine on an often-crowded aisle.

For these reasons, we find no merit in Ms. Thymes' argument that the jury should have found the Golden Nugget failed to use reasonable care to remove the danger posed to casino patrons by the sled-based chair.

***The Nature and Extent of Ms. Thymes' Injuries and Damages***

**Assignment of Error Number 4**

Ms. Thymes' fourth assignment of error focuses on the injuries she allegedly sustained as the result of her fall at the Golden Nugget. She asserts in her assignment of error that the jury was clearly wrong in refusing to find that she was injured in the fall at the Golden Nugget and in failing to assess damages for past and future medical expenses, past and future pain and suffering, permanent disability, past and future mental anguish, and loss of the ability to enjoy life. We note that the jury did check

off "No" to this question on the verdict form, finding that Ms. Thymes did not suffer injuries as a result of the March 4, 2017 incident.

Ms. Thymes claims that prior to the March 4, 2017 fall at the Golden Nugget, she was in good health with no neck or back pain. As a result of the fall, however, she claims to have injured her neck and back, consisting of herniated discs at the C4-5 and C5-6 levels and multiple herniated discs in the lumbar area. Ms. Thymes' medical treatment for these alleged injuries includes conservative care, physical therapy, medications, cervical and lumbar epidural steroid injections, two low back radio infrequency ablations, and a neck surgery consisting of a cervical discectomy and fusion at the C4-5 and C5-6 levels. Medical testimony and records were introduced at trial to show that Ms. Thymes went to the emergency room the night of the incident with complaints of pain in her left leg and lower back. Additional medical testimony and records were introduced by Ms. Thymes' physical therapist, Dr. Gabor Farkas, and orthopedic surgeon, Dr. Kenneth Berliner, detailing her treatments in the months following the incident.

In their appellee brief, the Golden Nugget addresses multiple inconsistencies with Ms. Thymes' testimony and evidence. Ms. Thymes told her medical providers that she hit her head on the floor when she fell, which contributed to the injuries to her neck. She repeated this claim when she testified at her deposition prior to trial, stating that she had viewed the video prior to the deposition and it showed her head hitting the floor. However, while testifying at trial, Ms. Thymes stated that she had since watched the video and admitted that it did *not* show her head hitting the floor. She believed instead that her head must have hit the rim on the bottom of the chair behind her. Yet, during cross-examination, Ms. Thymes returned to her claim that her head hit the floor very hard. The jury was shown several clips from the

surveillance video, from two different angles, showing Ms. Thymes falling over in the chair. We note that it is difficult to tell from the video clips what, if anything, Ms. Thymes' head hit as she fell. The jury could have reasonably concluded, based on the way she fell and her changing stories about what she hit while falling, that Ms. Thymes was not seriously injured.

Additionally, in her petition, filed November 13, 2017, Ms. Thymes alleged that she sustained injuries to her left wrist and knees. However, when testifying before the jury in March 2022, Ms. Thymes stated, for the first time, that she was withdrawing her claims for compensation for any injuries to her knees or to her wrist.

> Q.     Now, why are you not seeking compensation for your knee or – your knees or your wrist?
>
> A.     Well, previously, I've had – I had problems with my knees, and I had a knee surgery, so to be honestly – to be honest about the situation with my knees, that's the reason why I don't feel that honestly speaking that – that I should get compensated from when I've already had – honestly had injury and an operation to my knee – surgery to my knee.

This withdrawal of Ms. Thymes' claim that she injured her knees and wrist in the fall at the casino, after almost five years of litigation, is another example of an inconsistency which the jury could have reasonably felt reflected upon Ms. Thymes' credibility.

Ms. Thymes' medical records, of which multiple volumes were filed into the record, are also inconsistent with her claims. According to Ms. Thymes, she was feeling fine and was healthy prior to her fall at the casino. However, records from her primary caregiver, Harris Health System-Martin Luther King, Jr. Health Services, as well as records from her physical therapist, Dr. Farkas, and orthopedic surgeon, Dr. Berliner, indicate that Ms. Thymes suffered from continuing neck pain, back pain, and headaches as the result of a 2015 motor vehicle accident. There are also

references to injuries sustained in a 2013 motor vehicle accident, but those records no longer exist.

When Ms. Thymes was questioned at trial about notes in her medical records attributing her neck and back pain to motor vehicle accidents, she insisted that those notations were errors. The following discussion is one such example.

> Q.     Okay. Let's talk about some more of these records that I'm going to label as erroneous medical records. And let's go to this one. This is the Harris Health Systems – oops – February 8th of 2019. Now, of course this is after you have seen Ariel Lee and she wrote that what she wrote –
>
> A.     Yes, sir.
>
> Q.     -- you know on March the 8th. And, of course, this note says here, "An established patient," and it says you sustained a posterior neck injury in an MVA ago.
>
> A.     Uh-huh (yes).
>
> Q.     "MVA ago." It does not say how long ago. But did you sustain a posterior neck injury in the MVA, or were you trying to convey this was another fall issue?
>
> A.     No. I never state – once again, I never said anything about a motor vehicle accident.
>
> Q.     Okay.
>
> A.     I don't – I don't know how that kept coming up in the record.

Another example of alleged "errors" in Ms. Thymes' medical records was discussed during her cross-examination, in reference to Dr. Berliner's records, her orthopedic surgeon.

> Q.     Back when I took your deposition in 2019, you were asked directly if you had had a motor vehicle accident in 2013. And during that deposition, you denied recollection of a 2013 motor vehicle accident.
>
> A.     Uh-huh (yes).

Q. As we stand here today at trial, do you recall being involved in a 2013 motor vehicle accident?

A. No, sir. I do not recall being in a 2013 accident at all.

Q. Okay.

A. I don't recall that at all.

**Mr. Beasley:**

Deven, can we see D-19, page 4?

**By Mr. Beasley:**

Q. Do you see towards the bottom of the screen, Ms. Thymes, it says, "PMH, she states she had a previous MVA from 2013 which resulted in neck pain but states her pain had subsided prior to March 4, 2017."

A. Mr. Beasley, to be honest with you, I don't recall that at all. I – I have not had – had an accident in 2013 that I can actually be honest to you about at this time. I – I know I didn't – I don't recall being in an accident. 2015, yes, sir, Mr. Beasley, I was in a motor vehicle – motor vehicle accident but not 2013. I don't even know – I can't attest to any of that.

Q. So we've discovered yet another mistake in your certified medical records?

A. It had to be, because I have – I have no recollection of being in a motor vehicle accident in the – in the year of 2013.

Despite Ms. Thymes not remembering being in a motor vehicle accident in 2013, Dr. Farkas, Ms. Thymes' chiropractor, testified that he did treat Ms. Thymes in 2013 for low back pain. Again, these inconsistencies reflect upon Ms. Thymes' credibility.

Based on the inconsistencies in the testimony and medical records, added to Ms. Thymes' decision to suddenly withdraw certain claims at trial, we cannot find that the jury was unreasonable in concluding that Ms. Thymes was not injured in her fall at the Golden Nugget. The jury's finding is not manifestly erroneous or clearly wrong. We note that even if the jury had found that some or all of Ms. Thymes' injuries resulted from her March 2017 fall at the casino, which we are not suggesting,

the jury concluded that the Golden Nugget did not have actual or constructive knowledge of the unsecured sled-based chair; thus, the Golden Nugget would not be liable for any injuries Ms. Thymes may have sustained. For these reasons, we find this assignment of error lacks merit.

## DECREE

For the foregoing reasons, the March 18, 2022 judgment of the trial court making the March 10, 2022 jury verdict a judgment of the court and dismissing Janet Thymes' claims against the Golden Nugget Lake Charles, LLC is affirmed. All costs of this appeal are assessed to appellant, Janet Thymes.

**AFFIRMED.**